IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHICAGO REGIONAL COUNCIL OF CARPENTERS PENSION FUND, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> WRIGHT CONTSTRUCTION AND INSTALLATION, INC., <br><br> Defendant. | Case No. 11 C 6928 <br><br> Judge Harry D. Leinenweber |

### MEMORANDUM OPINION AND ORDER

This action is brought under Section 502 of the Employee Retirement Income Security Act ("ERISA") and Section 301 of the Taft-Hartley Act. The Plaintiff Benefit Funds are multi-employer ERISA funds that provide pension, annuity, welfare, and apprentice benefits. The Welfare Fund provides health insurance benefits to carpenters and their families (collectively, hereinafter, the "Funds"). The Funds are funded through employer contributions which are a set amount for each hour worked by a carpenter. Employers are required to file a report monthly containing the name of the carpenter employee, the hours worked and the gross wages paid that month. The employer then is required to pay to the Funds the amount due based on the hours worked times the contribution rate. In order to insure

compliance the funds have an audit program and the employers must submit their books and records to the auditor selected by the Funds. After the audit is completed, the audit is sent to the employer for comments and objections. If the employer has a satisfactory response to an item in the audit it will be removed. If it does not satisfy the auditor, the item remains and the employer must pay the amount alleged to be due. If the employer fails to pay, the Funds can bring a collection action (such as this one) in federal district court.

The audit that is the subject matter of this case covered the period from April 2008 to March 2011 and resulted from a painfully slow auditing process. There were three preliminary audits prepared before the final audit (Joint Exhibit 1), which was not completed until May 29, 2013. The audit disclosed a discrepancy in the amount of $763,058.58, the vast majority of which resulted from the failure of the Defendant Wright Construction and Installation, Inc. (hereinafter, "Defendant" or "Wright) to report as covered work, certain carpentry work performed at Fort Bragg, North Carolina. A final audit however is not necessarily the final step in the collection process. The employer can still sit down with the Funds and offer further evidence that certain work listed as covered work was nevertheless not subject to the contribution rate.

Here the evidence disclosed that the work at Fort Bragg was actually performed by a separate company, Premier Access and Flooring ("Premier"). This company was incorporated in 2009 specifically to bid on and perform the carpentry work at Fort Bragg, and was not a signatory to any Collective Bargaining Agreement ("CBA"). The reason given by Alex Barker ("Barker"), Wright's President, was that North Carolina is a right-to-work state and a union employer who has to pay union wages and union benefits would not be competitive with local contractors. Premier employed approximately 40 carpenters to do the Fort Bragg work. This work crew included between 5 or 6 carpenters that had previously worked for Wright in carpentry jobs around the Midwest. Wright was able to convince the Funds that the work done by North Carolina carpenters, who did not belong to a carpenters union, should be removed from the audit and the discrepancy amount was reduced by almost $700,000.00. However, the Funds still contended that carpentry work done by the carpenters that had previously been employed by Wright should be covered work subject to contribution. This reduced the amount claimed in the audit from the $763,058.58 to $62,859.30, of which $30,085.36 was attributable to work done by Premier. The remaining amount, $32,773.98, was due to audit discrepancies

based on failure to explain direct payments made by the Defendant.

The trial started off with a Motion in Limine filed by Defendant to exclude the Premier work because the Funds had failed to plead alter ego and Premier is not a signatory to the CBA. This was met by a response from the Funds that they were not relying upon an alter ego theory but were relying on Section 6.14 or the CBA. Section 6.14 of the CBA provides as follows:

> 6.14. In the event that the employees are required to work outside the geographical jurisdiction of their home local, they shall be paid the higher rate of wages and fringe benefit contribution rates under the agreement covering the employee's home local or the agreement covering the area where the work is being performed.
>
> In the event that the employees are required to perform work outside the geographic jurisdiction of the Union and the employer is not covered by an agreement with an affiliate of the United Brotherhood of Carpenters and Joiners of America, the terms and conditions of this Agreement shall be binding with respect to the employee being required to work outside the geographic jurisdiction of the Union.

The Funds contend that since the employees were Wright employees and were required to work outside of their geographic area, Wright must pay contributions in accordance with the CBA for carpentry work performed by the Wright employees. Defendant, however, argues that this provision only applies to

Wright employees and the subject workers were not actually employed by Wright for the Fort Bragg work, but by Premier. Thus, the only way that they could be brought under the CBA would be through an alter ego theory which the Funds have specifically declined to pursue.

While the three employees who testified at the trial each testified that he thought he was a Wright employee and thought that he would receive the benefits promised by the CBA, nevertheless, none of them was particularly clear as to his understanding and none of them made any complaints to the Union as to the fact that they were receiving lower pay and no benefits. Furthermore, Barker, who did the work creating Premier (although his 83-year-old mother was named as President), stated that he needed to create Premier so that he could make a competitive bid in North Carolina, and that his successful bid was approximately one-third lower than what he would have had to bid with union employees. He stated that he offered to have Premier employ any of his regular employees who wanted to go to North Carolina to do the work. Apparently, this was a slow time for union carpenters in Illinois and this offer provided a substantial amount of work to those who accepted the offer. The evidence also showed that the employees prepared applications to work for Premier, were carried on Premier's books

as Premier employees, received paychecks from Premier, received W-2s from Premier, and wore Premier badges. It is clear, therefore, absent an application of alter ego, that the specific employees, which the audit contends were subject to the CBA and the contribution requirement at the time they performed the carpentry work at Fort Bragg, North Carolina, were employees of Premier and not of Wright, and the Court so finds.

With regard to the balance of the amount alleged to be due under the audit, these sums are claimed to be due as a result of work paid for by Wright Construction, the CBA signatory. These are due as a result of the audit and the failure of Defendant to provide documentary evidence to contest them. An employer must "maintain records with respect to each of his employees sufficient to determine the benefits due or which may become due to such employees." 29 U.S.C. § 1059(a)(1); *Trustees of the Chicago Painters & Decorators Pension v. Royal International Drywall & Decorating,* 493 F.3d 782, 786 (7th Cir. 2007). The three small items mentioned by Barker in his testimony were included as a result of Wright's failure to supply documentary evidence as to the type of work performed. A trial is too late to contest these items.

Accordingly, the Court finds that Funds are entitled to the sum of $32,773.98 in contributions from Wright together with

liquidated damages, costs and attorneys' fees. The Plaintiff Funds are requested to make the required computations to establish the total amounts of the Judgment. The Court will then enter Judgment accordingly.

**IT IS SO ORDERED.**

　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Harry D. Leinenweber, Judge
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　United States District Court

Dated: May 12, 2016